45 119
77 629

DENNIS NEIL v. A. E. SHACKELFORD, ADMINISTRATRIX.

1. TENANCY IN COMMON—CONSIDERATION OF RELEASE.—That one of two tenants in common in several city lots occupied less than one half of the lots so held, and erected thereon valuable improvements, and engaged at his own expense in storing goods, formed a sufficient consideration for a release by the other tenant in common of all claim to the profits arising from the storage.

2. SAME.—In an action by one tenant in common against the other for an account of profits made by him while carrying on business on his own account on a part of the property so held in common: *Held*, correct to instruct the jury—(1) that the owner of an undivided half of the lots had a right to use and occupy any portion of the same, subject to the equal right of use and occupation by the plaintiff; and that defendant would not render himself liable for use, &c., until plaintiff should demand to enter and equally use the lots; (2) that to recover, the plaintiff must prove an express agreement by the defendant to account for one half of the value of the use, &c. ; (3) that defendant was not bound to account to plaintiff for the profits resulting from improvements put upon the lots or for labor and care in conducting any business thereon, unless there was an agreement to that effect.

APPEAL from Galveston. Tried below before the Hon. A. P. McCormick.

Dennis Neil sued John Shackelford, 29th March, 1861, for

an account of and for one half of profits received by Shackelford for storing railroad iron on certain city lots in Galveston.

The defendant answered, May 31, 1861, a general demurrer and general denial.

June 8, 1867, Shackelford amended his answer, pleading a release, as follows:

" STATE OF TEXAS, }
*County of Galveston.* }

"Know all men by these presents that I, Dennis Neil, half owner of lots two, three, and four in block 626, on Strand street, in the city of Galveston, county and State first above written, with J. Shackelford; that rumors are in circulation and questions often asked me if I were not interested in the storage charged by said J. Shackelford to the Galveston, Houston, and Henderson Railroad Company. Now, I, the said D. Neil, ever entertaining for the said J. Shackelford the profoundest friendship and respect; and life being uncertain; and the said J. Shackelford, having, as he thinks, probably used my name in some way in connection with the storage of the said G. H. and H. R. R. Co.'s iron, &c., on the above-specified lots, might, after my death, if it occurred before his, be troubled by the representative or representatives of my estate; and ever having been friendly, (yet the best friends might become enemies towards each other,)— therefore, in view of all such contingencies, I, the said D. Neil, hereby disclaim any interest whatever in the said storage of the said iron, &c., for the above-noted railroad company; neither have I expected any interest, never having expended or been called on for a cent of the expenses incurred by the said J. Shackelford in fixtures on the above-named lots for the storage above named. And I hereby further authorize the said J. Shackelford to continue the use of my name whenever he discovers (if ever again) it necessary in the prosecution of his claim or claims against the said G. H. and H. R. R. Co. for storage, &c., above noted : provided,

no costs or expenses for such prosecution is allowed against myself, heirs, or legal representatives.

"Given under my hand this 13th day of February, A. D. 1859.                                        D. NEIL.

"In presence of witness:

    "T. W. SCOTT,

    "GEORGE WALSHE."

To this the plaintiff pleaded *non est factum.* May 30, 1868, defendant further amended, setting out carefully the items of expense by him laid out and incurred in erecting yards and in the business for which the alleged moneys by him received on account of storage, &c., for the railroad, were allowed and paid by the railroad company.

Pending the suit defendant died, and his administratrix was made party.

Verdict was rendered for defendant. Motion for new trial was overruled, and Neil appealed. The further facts are given in the opinion.

*L. Thompson, Jr.,* for appellant.

I. The first error assigned is upon the overruling of appellant's demurrer to the amended answer of the defendant, filed by him June 8, 1867, setting up the instrument of writing pleaded as a release, &c.

The causes of exception assigned in the demurrer are: 1st, that the writing pleaded is not alleged to have been made and executed upon any good or valuable consideration; and, 2d, that the said writing purports on its face to be purely voluntary in its character, and not to be founded upon any consideration deemed good or valuable in law.

At common law, considerations may be either good or valuable. A good consideration is such as that of blood or of natural love and affection; a valuable consideration is such as money, marriage, or the like, which the law esteems an equivalent given for the grant, and is, therefore, founded in

motives of justice. (1 Pars. on Cont., 457, (369;) 2 Blackst. Comm., 297.)

The fundamental distinction in the common law is between those cases where the consideration is a benefit to the promisor, and those in which it is some injury to the promisee; in either case it is sufficient to support an assumpsit. (*Ib.*)

It is in vain to look for any consideration which is deemed good or valuable in law, either in the so-called release, the amended answer, or in the proofs in the case. There is no benefit or advantage shown to have been received by the appellant, by whom it purports to have been executed, or any disadvantage, detriment, or loss to John Shackelford, to whom it is alleged to have been delivered. The consideration which is expressed is, that the "said D. Neil, ever entertaining for the said J. Shackelford the profoundest friendship and respect, and life being uncertain," &c. Now, the law is clear that neither "love and affection," nor "friendship," nor any mere moral duty or obligation, nor any voluntary courtesy constitute a sufficient cause or consideration for the fulfillment by coercion of a simple contract or promise. (Holliday *v.* Atkinson, 5 Barn. & Cress., 501; 8 Dow. & R., 163; Harford *v.* Gardner, 2 Leon, 30.)

It was, however, argued that a sufficient consideration is to be found in the conclusion of the instrument, in which the appellant is made to say that he had never expended any money, or had been called upon for a cent of the expenses incurred by the said J. Shackelford in fixtures upon the lots for the storage of the iron, &c., and is not to be called upon for any costs or expenses to be incurred in the prosecution of the claim therefor. To this we reply that if any valid consideration could be found in this portion of the instrument, it could only exist if J. Shackelford had been a party thereto; in other words, there is a want of mutuality. Shackelford does not agree that he will not demand of Neil a proportion of the expenditure incurred or paid by him for the fixtures, nor does he promise to indemnify Neil against liability there-

for, or for costs and expenses to be incurred in coercing payment from the railroad company. It must be obligatory upon both parties at the same time, so that each may have an action upon it, or it will bind neither. If one only is bound, there is no consideration for the promise of the other, and such promise is consequently *nudum pactum*. (Nichols *v.* Raynbred, Hob., 88, *b.;* 2 Dowl. P. C., 481, S. C.)

We presume, however, that the decision of the court below was based upon the act of the Legislature of February 2, 1858, entitled "An act to dispense with the use of scrolls and seals in certain cases," no reasons having been assigned for the ruling.

To understand the views which we desire to present to the court, it will be necessary to refer to the common law, the previous enactments of the Legislature, and the Constitution which formed the organic law of the State at the time of the passage of the act of February 2, 1858.

All contracts are, by the law of England, distinguished into agreements by specialty and agreements by parol; and there is not any such third class as contracts in writing. If they be merely written, and not specialties, they are parol, and a consideration recognized by the law as good or valuable must be alleged and proved. If the contract be evidenced by deed, under the hand and seal of the contracting party, then, although there be no express consideration, yet it is, as between the parties thereto, sufficient. (Rann *v.* Hughes, in Dom. Proc., 7 Term R., 350.) By act of April 3, 1846, the defendant in any action of law or in equity, upon any bond, note, covenant, or other agreement in writing, was permitted to plead a partial failure of consideration, in certain cases. (See Paschal's Dig., art. 227.) And by the act of May 13, 1846, it is enacted, that in any suit founded on any instrument or note in writing, under the seal of the party charged therewith, the defendant may, by special plea, impeach or inquire into the consideration thereof, in the

same manner as if such writing had not been sealed, etc. (Paschal's Dig., art. 228.)

The effects of these two provisions of the Legislative acts of 1846 operated to abrogate the common law of England with respect to those contracts which were evidenced by a specialty, and to reduce sealed instruments in this particular to the rank and condition of mere parol contracts.

Now, we have the act of February 2, 1858, dispensing with the use of scrolls and seals in certain cases, the last member of which act provides, " And every contract in writing hereafter made shall be held to impart a consideration as fully, and in the same manner, as sealed instruments have heretofore done." This act seems to have been framed and passed without reference to the two acts of 1846. Did the Legislature mean to restore the common-law sanctity of sealed instruments—that the simple fact of sealing imparted a consideration *inter partes?* or was it intended that the written contract should be evidence of a specialty, and imparting " a consideration as fully and in the same manner" as a specialty would under the acts of April and May, 1846? If the latter, then the concluding member of the section was useless verbiage, altogether superfluous, tending rather to obscure than to elucidate the prior clauses of the statute. If by it the Legislature designed to restore the common-law effect and force of sealed instruments, and to give to merely written instruments the same character, then it would operate *pro tanto* a repeal of the act of 1846, if the maxim of *leges posteriores priores contrarias abrogant,* or a repeal by implication, was permissible under the Constitution of 1845, which was the organic law at the time of the passage of the act of February 2, 1858. The section 25 of art. VII of the Constitution of 1845 provided that no law should be revised or amended by its title, " but in such cases the act revised or section amended shall be re-enacted and published at length." The same provision has been retained in the present Constitution, and will be found in section 18 of article XII.

No argument is necessary to show the antagonism between the acts of 1846 and the act of 1858. By the terms of the former even a sealed instrument does not *inter partes* import a consideration; and by the latter, a parol contract, if written, does import a sufficient consideration.

II. The second assignment of error is based upon the instruction of the court to the jury, which is in the following terms: "If you find that said instrument, in its present shape and language, was so made by said plaintiff, (now appellant,) you are charged that said instrument is a complete defense to the plaintiff's suit, and you will find for defendant."

In support of this assignment of error, we beg leave to refer to our argument upon the preceding assignment, and in addition thereto, we refer to the following principles of law.

If no consideration is mentioned in a deed, you may enter into proof of consideration, (3 Term R., 474;) but if any consideration is mentioned, and it is not said for other considerations, you cannot prove any other than that recited. (1 Comyn's Dig., 541, b. 2; 1 Ves., 127; 2 Peere Wms. R., 204; Jones *v.* Sasser, 1 Dev. & Bat., 446.)

A deed or grant made without any consideration is, as it were, of no effect, for it is construed to inure to be effectual only to the use of the grantor himself. (2 Blackst. Comm., 296; Per Smith, J., 4 Yeates, 96; Davis *v.* Turner, 26 Tex., 98.) And so, in respect to voluntary contracts, or such as are not founded on a valuable consideration, courts of equity do not interfere to enforce them, either as against the party himself, or as against other volunteers claiming under him. The same rule is applied to imperfect gifts, not testamentary, *inter vivos,* to imperfect voluntary assignments of debts, &c. (2 Story's Eq. Jur., sec. 793*a,* and authorities cited in margin; Edwards *v.* Jones, 1 Mylne & C., 226; 13 Cond. Eng. Ch., 375; Same Case, 7 Simons, 525; 10 Cond. Eng. Ch., 79; Mills *v.* Wyman, 3 Pick., 207; 3 Bos. & Pull., 249, note *a.*)

Assuming, as we have full warrant to do from inspection

of the transcript of the record, that no valid consideration is recited in the instrument itself, nor alleged in the answer pleading it, and none proved upon the trial, that in this supposed unilateral engagement, contract, release, or disclaimer, no profit or advantage inures to the promissor or maker therefrom, and no loss, detriment, or injury to the promisee or grantee; that it was and is simply and purely *nudum pactum*,—it was manifestly erroneous to instruct the jury that if they found it was executed by appellant in its present shape and language, then, that it was a complete defense to appellant's suit. The maxim of the law—"*nuda pactio obligationem non parit*"—seems to have been utterly disregarded by this charge.

The principle of law which we invoke may be well illustrated by the familiar case of the acceptance and receipt of a smaller sum in full satisfaction of a larger one. It is impossible, say the authorities, save by a release under seal, that the acceptance of the smaller sum is an extinguishment of the larger. There must be some consideration for the relinquishment of the residue—something collateral to show a possibility of benefit to the party relinquishing his further claim—otherwise it is *nudum pactum*. (Fitch *v*. Sutton, 5 East R., 230; Per Bayley, J., in Lodge *v*. Dicas, 3 Barn. & Ald., 614.)

III. We propose to consider the third, fourth, fifth, and sixth assignments of error together.

The third assignment of error embraces that portion of the instructions given by the court below to the jury, that Shackelford, being owner of one undivided moiety of the lots, had a right to enter upon the same, and to enjoy the use and occupation thereof without account to his cotenant in common until appellant should demand to enter himself upon the lots and equally use the same.

The fourth assignment of error is upon that portion of the charge of the court below in which the jury was instructed that to recover on this action, the plaintiff, now appellant,

must prove an express agreement on the part of Shackelford to account to him for one half of the value of the said occupation of said lots.

The fifth assignment of error, upon that portion of the charge by the court below in which the jury was instructed that the defendant Shackelford was not bound to account to appellant for the profits resulting from improvements put upon said lots, or from labor and care invested in conducting any business thereon, unless there was an agreement between them to that effect. And to the same effect is the portion of the charge objected to in the sixth assignment of error. The portions of the charge excepted to, and referred to briefly under this head, are fully set forth in the assignment of errors.

While we are free to admit that at and by the strict rule of the common law of England joint tenants and tenants in common could not at law maintain an action against their cotenants who received all or more than their share of the profits, unless the relation of bailiff could be established, of the joint or common property, until by the act of 4 and 5 Anne, ch. 16, § 27, (A. D. 1706,) the Legislature extended the common-law action of account render, so as to include such and the like cases, yet long before that time the courts of equity had assumed and exercised such jurisdiction.

Judge Story says: "Cases of account between tenants in common, between joint tenants, between partners, between part-owners of ships, and between owners of ships and the masters, fall under the like considerations. They all involve peculiar agencies, like those of bailiffs, or managers of property, and require the same operative power of discovery and the same interposition of equity. Indeed, in all cases of such joint interests, where one party receives all the profits, he is bound to account to the other parties in interest for their respective shares, deducting the proper charges and expenses, whether he acts expressly by their authority, as bailiff, or only by implication, as manager, without dissent, *jure domini*, over the property." (1 Comm. Eq. Juris., sec. 466, citing in the

margin Abbott on Ship., b. 1, ch. 3, §§ 4, 10, 11, 12; Doddington *v.* Hallett, 1 Ves., 497; *ex parte* Young, 2 Ves. & Beam, 242; Comyn. Dig., title Chancery, 3 V. 6, 2 A. 1; Drury *v.* Drury, 1 Rep. in Ch., 49; Strelly *v.* Winson, 1 Vern. Ch. R., 297; Pulteney *v.* Warren, 6 Ves. Jr., 73–92; see also Lorimer *v.* Lorimer, 5 Madd. Ch. R., 223.)

The case of Drury *v.* Drury was decided according to the report, 6 Charles I, (1631;) and that of Strelly *v.* Winson, 35 Charles II, (1684,) long before the passing of the act of 4 and 5 Anne, c. 16; so that the provisions of the 27th section of the said statute could not have influenced the decisions; so also, from a careful examination of the subsequent cases, they appear to have been founded upon the equity jurisprudence assumed and exercised by the courts of chancery in England, and not upon any provision of the statute.

We presume that the statute, 4 and 5 Anne, c. 16, is not in force in this State under the decisions of the Supreme Court; but whether it is or is not, we deem it a matter of no importance; in either case the right of the appellant to maintain his action seems to us beyond dispute.

The district and other courts of this State are courts of equity as well as of law. Mr. Sayles says, in his recent work upon pleading: "In our practice there is no difference in the mode of proceedings in the application of legal and equitable remedies; nor are there any forms of action adapted to different remedies. The pleadings in all cases consist of the petition and answer, and the court can administer the relief appropriate to the case presented by the pleadings. Demands entitling a party to legal and equitable relief can be united in the same action; an equitable defense can be opposed to a legal demand, or a legal defense to an equitable demand. The court may frame its judgment so as to afford all the relief which may be required by the nature of the case and is granted by courts of law or equity, and may grant all orders, writs, and other process necessary to obtain such relief." (Sec. 4, citing Smith *v.* Doak, 3 Tex., 215, 218;

Smith *v.* Clopton, 4 Tex., 109; Mitchell *v.* Sheppard, 13 Tex., 484, and other cases, which fully support the text.)

We propose now to refer to the American adjudications which support the right of the appellant to maintain this action against his co-tenant for a moiety of the net profits received from the use of the lots.

In Pennsylvania, where, like Texas, their courts exercise jurisdiction in law and equity between the same parties and in the same action, the principle contended for is fully asserted. Thus, in Barrell *v.* Barrell, the court held that one tenant in common may maintain *assumpsit* against his co-tenant to recover a share of the profits, upon proof that the whole was received by the defendant. In such case, the law raises an implied promise to pay over the plaintiff's share, and he is not driven to his action of account render. (9 Casey (33 Penn. State Rep.) 492, citing with approbation the previous cases of Gillis *v.* McKinney, 6 Watts & Serg., 78; Golbreath *v.* Moore, 2 Watts, 86; and also Coles *v.* Coles, 15 Johns., 159; Brigham *v.* Eveleth. 9 Mass., 538.)

No brief for appellee came to hands of the reporters.

REEVES, ASSOCIATE JUSTICE.—It appears from the pleadings and evidence that Dennis Neil and John Shackelford were joint owners of lots Nos. 2, 3, and 4 in block No. 626 in the city of Galveston. Shackelford used a portion of the lots as a bonded yard, for the reception and storage of such unclaimed and bonded goods as were committed to him for safe-keeping by the collector of customs at the port of Galveston. In the years 1855 and 1856 a large quantity of railroad iron for the Galveston, Houston, and Henderson railroad was stored in the yard by the collector of customs as unclaimed property.

It is charged in the petition that Shackelford received from the railroad company a large sum of money for the storage of the iron and other materials of the company upon the lots, one half of which sum is claimed by Neil in this suit.

Shackelford answered by a general demurrer and general denial; and, by a special plea or answer, set up that Neil had released and assigned to him all right and interest in the claim for storage against the railroad company. The written evidence of the release bears date February 13, 1859. To this the plaintiff excepted, and filed a plea of *non est factum.* After this the defendant set out more fully his defense by an amended answer.

The first trial resulted in a verdict for the plaintiff, which was set aside by the court, and a new trial granted. On the second trial the jury returned a verdict for the defendant, from which the plaintiff has appealed, and, for error, assigns that the court erred in overruling his demurrer to the defendant's amended answer setting up the release of Neil to any claim for the storage of the iron belonging to the railroad company, 1st, because it is not alleged that the release was executed upon any good or valuable consideration; 2d, because the release purports on its face to be voluntary and without any good or valuable consideration in law.

It is recited in the release that Neil had never expended any money, or had been called upon for any part of the expenses incurred by Shackelford in making improvements, and stipulating that he is not to be called upon for any part of the costs or expenses for prosecuting the claim against the railroad company.

It was shown that Shackelford paid for the improvements, consisting of a fence, inclosing about two thirds of the one half of the lots in which the iron was stored. It was further shown that he paid the charges for drayage, wharfage, and labor for storing the iron in the yard bonded and opened by him for that purpose. He also paid for entering the different cargoes of iron at the custom-house, and paid the warehousemen or employees of the collector. These charges, with other items shown by the account attached to the defendant's answer as an exhibit, and which, as shown by the evidence, were incurred and paid by the defendant alone,

formed a sufficient consideration to support the release. (Bason, Adm'x, v. Hughart, 2 Tex., 476; James v. Fulcrod, 5 Tex., 512.)

A part of these charges were incurred and paid before, and a part after the execution of the release.

The second assignment of error relates to that part of the charge of the jury which is as follows: "If you find that said instrument, in its present shape and language, was made by said plaintiff, you are charged that said instrument is a complete defense to the plaintiff's suit, and you will find for defendant."

Having shown that the instrument is founded on a sufficient consideration, this assignment will not be examined further in this connection.

The third, fourth, fifth, and sixth assignments may be considered together.

The third assignment is an objection to that portion of the charge instructing the jury in substance that Shackelford, being owner of one undivided half of the lots, had a right to use and occupy any portion of the same, subject to the plaintiff's equal right of use and occupation, and that the defendant would not render himself liable to the plaintiff for use and occupation until the plaintiff should demand to enter upon the lots, and equally use the same.

Fourth. That the plaintiff, to recover in this action, must prove an express agreement to account to him for one half of the value of the use and occupation of the lots.

Fifth. That Shackelford was not bound to account to Neil for the profits resulting from improvements put upon the lots, or for labor and care invested in conducting any business thereon, unless there was an agreement to that effect.

Sixth. If the jury believe from the evidence either that the written disclaimer was executed by Neil, or that there was no agreement between the parties that Neil should share the profits from the storing of the iron, or that there was no net gain or profits realized by Shackelford, they should find for him.

It is not necessary to examine particularly all the different phases of the case as presented to the jury, but only to examine so far as may be necessary to dispose of the questions arising on the pleadings and evidence as affecting the rights of the parties.

The case, as presented by counsel in the brief for appellant, involves a question of agency, as where one party manages the property for the benefit of himself and others jointly interested with him in the estate.

The plaintiff in his petition alleges that the defendant, in his own name and with the consent of the plaintiff, contracted with the railroad company for the storage of their iron upon the lots during the years 1855, 1856, 1857, and 1858, with the promise on the part of the defendant to plaintiff that the money arising from the use of the lots should be equally divided between plaintiff and defendant when realized and paid to defendant.

The evidence fails to establish the allegations of the petition. There was no evidence of any promise by Shackelford to Neil that the money arising from the use and occupation of the lots should be divided between the parties. The only evidence that Shackelford acted as managing owner of the lots was that Shackelford paid the taxes on the lots and charged one half of the amount to Neil. Nor does it appear that any relation existed between the parties other than that of tenants in common of the property.

"Where one tenant in common," says Story, "has been in the exclusive perception of the rents and profits, on a bill for a partition and account, the latter will also be decreed." (1 Story's Eq. Ju., sec. 655.)

It appears that the improvements were erected on and included less ground than Shackelford's share on partition.

"If improvements have been made by one tenant in common, a suitable compensation will (as we have seen) be made him upon the partition, or the property on which the improvements have been made, assigned to him." (1 Story's Eq. Ju.,

sec., 656*b;* Robinson *v.* McDonald's Widow and Heirs, 11 Tex., 385.)

No agency and no promise of Shackelford was shown to make him. liable to Neil for a share in the storage business. Shackelford's possession was not exclusive, nor did it appear that the portion of ground on which the improvements were made, might not have been assigned to him on partition without prejudice to Neil.

. The court properly instructed the jury upon all the issues in the case, and in doing so the instructions embraced the issue upon the plea of *non est factum,* and the effect that should be given by the jury to the written release or disclaimer if they believed it was executed by Neil. The jury may have found their verdict on other issues and not on the plea of *non est factum;* still it becomes necessary to examine the plea, as the finding upon it is assigned for error.

The court instructed the jury "that the burden of proving the execution of the instrument was upon the defendant, and that the defendant must prove to their satisfaction that the instrument in exactly its present shape and language was executed by Neil, and left in the possession of Shackelford."

John B. Jones, attorney for Shackelford, testified that he had seen the written release in 1861, soon after the commencement of this suit, and stated as the reason why he did not plead the release at the first term of the court, that he merely wished to keep off a default judgment, and the war coming on no more suits were tried, and he had no use for the paper until the courts were opened again, and handed it back to Shackelford for safe keeping.

After the release had gone to the jury it was their province to decide the issue of fact arising upon the plea of *non est factum.* There is no such preponderance of evidence against their finding as would warrant this court in setting the verdict aside.

It was necessary for the defendant to prove the release or disclaimer in the same manner that the plea of *non est factum*

was required to be proved at common law. (Austin *v.* Townes, 10 Tex., 24, 31; Brashear *v.* Martin, 25 Tex., 202; Paschal's Dig., arts. 1442, 1443.)

There was no error in excluding the plaintiff from testifying as a witness in the case. (Paschal's Dig., art. 6827.)

The declarations of Shackelford in 1858, in substance that Neil was interested with him in the claim for storage, would not affect the release in 1859.

The instructions asked by appellant have been noticed and disposed of in discussing the other assignments of error.

We are of opinion that there is no error in the instructions of the court or in the verdict of the jury requiring a reversal of the judgment, and the same is affirmed.

AFFIRMED.